# COURT OF APPEALS
## DECISION
## DATED AND FILED

## June 14, 2022

Sheila T. Reiff
Clerk of Court of Appeals

## NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| Appeal Nos. | 2022AP420 | Cir. Ct. Nos. 2020TP119 |
|---|---|---|
| | 2022AP421 | 2020TP120 |
| | 2022AP422 | 2020TP123 |

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO N.R., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

    V.

Q.S.,

      RESPONDENT-APPELLANT.

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO N.S., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

    V.

Q.S.,

**RESPONDENT-APPELLANT.**

---

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO N.S., A PERSON UNDER THE AGE OF 18:**

**STATE OF WISCONSIN,**

    **PETITIONER-RESPONDENT,**

  **V.**

**Q.S.,**

    **RESPONDENT-APPELLANT.**

---

APPEALS from orders of the circuit court for Milwaukee County: MARSHALL B. MURRAY, Judge. *Affirmed*.

¶1 BRASH, C.J.[1] Q.S. appeals the orders of the trial court terminating his parental rights to N.R., Na.S., and Ne.S.[2] Q.S. argues that the court erroneously exercised its discretion when it determined that it was in the best interests of the children to terminate his parental rights. Upon review, we affirm.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] Because two of the children have the same initials, we use the second letters of their first names to differentiate between them.

## BACKGROUND

¶2      Q.S. is the adjudicated father of N.R., born in March 2010; Na.S., born in February 2012; and Ne.S., born in March 2018.  Q.S. and the children's mother, C.F., are not married but are "long-time partner[s]."

¶3      In March 2017, the Division of Milwaukee Child Protective Services (DMCPS) received a referral regarding the family due to domestic violence between Q.S. and C.F.  It was reported that Q.S. punched C.F. "five times in the face and strangled her."  Q.S. then drove off, dragging C.F. "for three or four houses."  An arrest warrant was issued for Q.S., as well as a warrant for violating his probation.  Additionally, C.F., who had a history of "out of control behaviors" related to substance abuse, appeared to be under the influence of drugs or alcohol at the time.  None of the children were injured, but N.R. and Na.S. witnessed the incident.

¶4      As a result, petitions for children in need of protection or services (CHIPS) were filed, and N.R. and Na.S. were placed in foster care.[3]  CHIPS dispositional orders were subsequently entered in August 2017, listing a number of conditions that had to be met before the children could be returned to their parents.

¶5      One of the conditions for Q.S. was to control his mental health.  He had previously been diagnosed with schizophrenia, and was not taking his medication at the time of the domestic violence incident.  Other conditions for Q.S. included a prohibition on committing any further crimes or engaging in

---

[3] C.F. had two additional children, younger than N.R. and Na.S., who were also detained at that time.  Q.S. is not the father of those children.

domestic violence at home or in front of the children, as well demonstrating an understanding of how domestic violence affects the children. Regular visitation with the children was also required.

¶6 That CHIPS order was in effect when Ne.S. was born in March 2018. At the time of his birth, the hospital conducted lab tests on Ne.S. because C.F. had two other children, born after Na.S., who had tested positive for cocaine; Ne.S. also tested positive for cocaine. After being released from the hospital, C.F. entered a residential drug and alcohol treatment facility where she stayed, with Ne.S., for approximately one month after his birth.

¶7 Upon C.F.'s discharge from the treatment facility, a safety plan for Ne.S. was implemented by DMCPS. Under the plan, C.F. was to continue day treatment at the facility; however, she missed many treatment appointments, and tested positive for cocaine several times over the next month. Ne.S. was thus detained by DMCPS in May 2018 and placed in foster care. A CHIPS dispositional order for Ne.S., which went into effect in November 2018, contained similar conditions as the CHIPS order for N.R. and Na.S.

¶8 Petitions for the Termination of Parental Rights (TPR) with regard to the children were filed in June 2020. In the petitions, the State's alleged grounds for termination included the continuing need of protection or services for the children, pursuant to WIS. STAT. § 48.415(2), and the failure to assume parental responsibility, pursuant to § 48.415(6). The petitions alleged that although Q.S. had participated in a domestic violence group, he continued to "deny or minimize" the abuse, and he "struggle[d] to understand the impact that [domestic violence] has had on the children," who exhibit symptoms of trauma.

¶9     In fact, N.R. and Na.S. have both been diagnosed with several mental health and behavioral disorders.  Although Q.S. is managing his mental health with required injections to treat his schizophrenia, he "does not seem to understand" the children's mental health issues.  It was also noted that the parents have a history of "inappropriate physical discipline" of the children, such as "whoop[ing] with a belt," and that the children had "expressed fear in seeing their parents together or being left without supervision."

¶10     Additionally, there was an incident during a partially supervised visit with Na.S. where Q.S. left to go to his cousin's home, which was in violation of the visitation rules.  After that visit, Na.S. "displayed regression in his behaviors, such as bed wetting and smearing feces in the bathtub," and the visits with Q.S. returned to being fully supervised.

¶11     Furthermore, inconsistency with maintaining stable housing was "an issue throughout this case" due to Q.S. and C.F.'s history of "multiple evictions." However, it was noted at the time the petitions were filed that Q.S. and C.F. had obtained Section 8 housing together, even with their history of domestic violence.

¶12     Q.S. entered a no contest plea in March 2021 to the ground of failure to assume parental responsibility, pursuant to an agreement with the State where the continuing CHIPS ground would then be dismissed.  The matter proceeded to disposition.

¶13     The disposition hearing took place over several days between June and August 2021.  The trial court heard testimony from the family's case manager, N.R.'s foster parent, and the foster parent of Na.S. and Ne.S.  Both Q.S. and C.F. also testified.

¶14    The trial court ultimately determined that it was in the best interest of each of the children that the parental rights of both Q.S. and C.F. be terminated.[4]    The court discussed the statutory factors for making this determination as they related to each child.  It further noted that although Q.S. had made improvements in his life, it had come "at the expense of his children" because someone else was taking care of them during this time.  In short, the court stated that the evidence did not demonstrate that the parents would be able to "handle" having the children returned to them, and thus it was in the children's best interest to remain in the stable homes where they had been placed.  This appeal follows.

**DISCUSSION**

¶15    On appeal, Q.S. asserts that the trial court erroneously exercised its discretion in determining that the termination of his parental rights was in the best interest of N.R., Na.S., and Ne.S.  "The ultimate determination of whether to terminate parental rights is discretionary with the [trial] court."  *State v. Margaret H.*, 2000 WI 42, ¶27, 234 Wis. 2d 606, 610 N.W.2d 475.  We will uphold this decision if the trial court applied the correct standard of law to the facts of the case.  *See id.*, ¶32.

¶16    In making the determination to terminate parental rights, "the best interests of the child is the paramount consideration" for the trial court.  *Id.*, ¶33.  The trial court's decision should reference the factors set forth in WIS. STAT. § 48.426(3), and any other factors it relied upon, in explaining on the record the

---

[4] C.F.'s parental rights to her other two children who were involved in these proceedings were also terminated.  C.F. is not a party in this appeal.

basis for the disposition. *Sheboygan Cnty. DHHS v. Julie A.B.*, 2002 WI 95, ¶30, 255 Wis. 2d 170, 648 N.W.2d 402.

¶17    The statutory factors that the trial court is required to consider are:

(a) The likelihood of the child's adoption after termination.

(b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.

(c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.

(d) The wishes of the child.

(e) The duration of the separation of the parent from the child.

(f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

WIS. STAT. § 48.426(3).

¶18    The record indicates that the trial court referenced all of these factors with regard to each child in its decision, and found that the evidence relating to each factor weighed in favor of the termination of parental rights. Indeed, Q.S.'s argument on appeal is not that the court did not consider the proper factors, but rather that it should not have weighed so heavily the evidence that was unfavorable.

¶19    For example, Q.S. asserts that the trial court put "great emphasis" on the domestic violence incident that precipitated the removal of N.R. and Na.S. in March 2017. However, this incident relates to several of the statutory factors. In

particular, it relates to the factor regarding the age and health of the children at the time of removal as compared to the time of disposition, *see* WIS. STAT. § 48.426(3)(b), because the evidence indicated that being exposed to domestic violence had a significant impact on their mental and behavioral health. In fact, N.R. required inpatient care at a mental health facility. N.R. also had significant dental issues that had not been addressed by his parents. Additionally, the case manager testified that even Ne.S., who was very young at the time he was detained by DMCPS, has exhibited behavioral issues, which may be related to his exposure to cocaine prior to his birth.

¶20 Furthermore, the case manager testified that the children's mental health and behavioral issues have improved since they were removed from their parents' custody. She also testified, however, that Q.S. had not been involved in the children's therapy. This evidence correlates with the statutory factor regarding whether the children are able to have a more stable home upon termination, *see* WIS. STAT. § 48.426(3)(f), and it indicates that would be the case here, as they have all been getting regular care for these needs since they were removed from their parents' custody.[5]

¶21 Q.S. also asserts that the court unfairly focused on the length of time all of the children have been in foster care. This, however, is an enumerated statutory factor that the trial court must consider. *See* WIS. STAT. § 48.426(3)(e). Furthermore, this time frame is also applicable to the court's consideration of the

---

[5] Additionally, the evidence indicates that although Na.S. and Ne.S. had an adoptive resource at time of disposition, N.R. did not. *See* WIS. STAT. § 48.426(3)(a). However, N.R.'s foster parent testified that she was committed to having him placed with her long-term.

factor regarding whether a substantial relationship exists between the children and Q.S. *See* § 48.426(3)(c). At the time of disposition, the children had been in foster care for over four years which, given their ages at the time they were removed, was a significant part of their lives: N.R. was seven years old at the time of removal, Na.S. was five years old, and Ne.S. was two months old. Moreover, the trial court observed that a substantial relationship involves not only love, but providing the care the children need, including their physical, psychological, and medical needs. The case worker testified that although Q.S. had made improvements in his own life during the time the children were in foster care, there had been very little improvement in the relationships he had with his children.

¶22 In sum, the trial court focused on the best interests of the children in deciding to terminate Q.S.'s parental rights, which is the "paramount consideration" in a TPR case. *See Margaret H.*, 234 Wis. 2d 606, ¶33. The court's findings are supported by the record, and by applying the correct standard of law to the facts of the case, the court did not erroneously exercise its discretion in terminating the parental rights of Q.S. *See id.*, ¶32. Accordingly, we affirm.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.